David B. Rosenbaum, 009819
Anne M. Chapman, 025965
OSBORN MALEDON, P.A.
2929 North Central Avenue, Suite 2100
Phoenix, Arizona 85012-2793
(602) 640-9000
achapman@omlaw.com
drosenbaum@omlaw.com

Eugene F. Assaf, DC Bar 449778 (*Pro Hac Vice*)
K. Winn Allen, DC Bar 1000590 (*Pro Hac Vice*)
Kirkland & Ellis, LLP
655 Fifteenth St. N.W.
Washington, D.C. 20005
(202) 879-5078
eugene.assaf@kirkland.com
winn.allen@kirkland.com

Douglas H. Meal, MA Bar 340971 (*Pro Hac Vice*)
Ropes & Gray, LLP
Prudential Tower, 800 Boylston Street
Boston, MA  02199-3600
(617) 951-7517
douglas.meal@ropesgray.com

Attorneys for Defendants

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Federal Trade Commission,<br><br>    Plaintiff,<br><br>vs.<br><br>Wyndham Worldwide Corporation, et. al.,<br><br>    Defendants. | Case No. CV 12-1365-PHX-PGR<br><br>**MOTION TO DISMISS BY DEFENDANT WYNDHAM HOTELS & RESORTS LLC**<br><br>**ORAL ARGUMENT REQUESTED** |

# INTRODUCTION

From 2008 to 2010, cyber criminals (allegedly from Russia) three times hacked into Wyndham Hotel and Resorts LLC's ("WHR's") computer network and the separate networks maintained by several independently owned hotels licensed to use the "Wyndham Hotels" brand. In response to these crimes, WHR alerted authorities, retained computer forensic experts, and implemented significant remedial measures. To WHR's knowledge, these criminals were never apprehended by authorities and no hotel guest suffered financial injury as a result of these crimes. Notwithstanding that WHR was a victim of hacking, the FTC has singled out WHR in this unprecedented litigation, claiming that WHR's cybersecurity practices are "unfair" and "unreasonable."

Hacking is an endemic problem. Media stories routinely appear about cyber attacks on private companies, including Google, Citibank, Microsoft, Sony, and many others, as well as government entities such as the CIA, DOD, NASA, FBI, and the FTC itself. To address pressing concerns of cybersecurity, Congress and the White House have made substantial efforts to enact various comprehensive cybersecurity laws—including the Cybersecurity Act of 2012—that would establish specific data-security standards for the private sector. The most recent efforts included a robust debate among the President, legislators, interest groups, and other stakeholders about the law's proper scope and the potential costs it could impose on private businesses. While the Cybersecurity Act failed to pass the Senate in August 2012, the White House has announced that it may issue an Executive Order addressing cybersecurity.

The FTC has not waited for Congress or the President. Instead of allowing the political process to settle the debate over the costs and benefits of cybersecurity policy, the FTC filed this action under Section 5 of the FTC Act, which forbids "unfair or deceptive" trade practices. WHR does not dispute that the FTC can bring enforcement actions against companies that make "deceptive" statements to consumers. But the Commission is attempting to do much more than that in this case. Relying on Section 5's prohibition on "unfair" trade practices—which has traditionally been read to

prohibit certain unconscionable or oppressive acts toward consumers—the FTC assumes that it has the statutory authority to do that which Congress has refused: establish data-security standards for the private sector and enforce those standards in federal court. But the FTC previously disclaimed the very authority it purports to wield here. In a report issued in 2000, the FTC acknowledged that it lacked authority to require firms to adopt specific data-security practices, and it asked Congress for legislation that would grant it that authority. *See infra* at 6-7. Although Congress never responded to that request, the FTC "decided to move forward on its own without any new, specific privacy laws or delegation of authority from Congress." M. Scott, *The FTC, The Unfairness Doctrine, and Data Security Breach Litigation: Has The Commission Gone Too Far?*, 60 Admin. L. Rev. 127, 143 (2008).

Nothing in Section 5 gives the FTC the power to set standards for the extremely complex computer software and hardware systems that businesses employ to ensure data security. And no court has *ever* held that the "unfairness" prong of Section 5 gives the Commission the authority to regulate a private company's data-security practices. Indeed, it is inconceivable that Congress would have delegated a policy choice of such significant political and economic consequence to the FTC through a statute that does no more than forbid "unfair" trade practices—"[Congress] does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001). Confirming that intuition, Congress has enacted no less than 10 federal statutes prescribing specific data-security standards for elements of the private sector. None grants the FTC the authority it claims here. Those subsequent acts shape the meaning of Section 5 and confirm that the statute's reference to "unfair" practices does not empower the FTC to oversee the data-security practices of private companies. As recently put in the *Wall Street Journal*, "[u]sing consumer protection laws to address cyber vulnerabilities is stretching the FTC's mission beyond recognition." Michael Chertoff, *The Lesson of Google's Safari Hack*, Wall Street Journal (July 22, 2012),

*available at* http://online.wsj.com/article/SB10001424052702303933704577532572854142492.html.

Indeed, the FTC's approach to data-security regulation in this very case only confirms that the Commission has neither the expertise nor the statutory authority to establish data-security standards for the private sector. The FTC has not published **any** rules or regulations that might provide the business community with *ex ante* notice of what data-security protections a company must employ to be in compliance with the law. *See* Scott, 60 Admin. L. Rev. at 143-144 (there are no "rulemaking proceedings, policy statements or guidelines from the Commission explaining what conduct … it deems 'unreasonable,' and hence actionable"). Instead, the FTC is enforcing its vision of data-security policy through this selective, *ex post* enforcement action, which seeks to hold WHR liable without any fair notice as to what the law required. Moreover, after a two-year investigation into WHR's data-security practices, the FTC is still unable to allege anything more specific than that WHR failed to employ protections that were "reasonable," "appropriate," "adequate," or "proper." The FTC's inability or unwillingness to state precisely what WHR did wrong—or to tell others in the business community what they must do to avoid similar lawsuits in the future—confirms that the Commission has no business trying to regulate data-security practices under the "unfairness" prong of the FTC Act.

The implications of the FTC's legal theories in this case are far-reaching. American businesses already face a dizzying array of specific federal statutes regarding data security—but WHR is not alleged to have violated any of those specific statutes. Instead, despite having previously conceded that it lacks authority to regulate data security, the FTC is now seeking judicial approval to extend its statutory power beyond what Congress has allowed and into highly technical areas where the FTC has no regulatory expertise. The FTC's approach would subject businesses to vague, unpublished, and uncertain requirements that would drastically alter the competitive

landscape—without Congress or the President actually settling the debate about the costs and benefits of data security for American businesses.

## BACKGROUND

WHR is a hospitality company that provides services to hotels operating under the "Wyndham Hotels" brand name (the "Wyndham-branded hotels"), a full-service hotel chain with over 70 locations in the United States. Am. Compl. ¶ 9. With few exceptions, each Wyndham-branded hotel is independently owned by a third party unaffiliated with WHR or the other defendants. *Id*. Most of those independent owners are authorized to use the "Wyndham Hotels" brand name pursuant to franchise agreements with WHR, through which WHR licenses the use of the brand name and agrees to provide services to the franchisee, who retains day-to-day responsibility for the hotel. *Id*. Other independent owners entered into management agreements with Wyndham Hotel Management, Inc. ("WHM"). *Id*. ¶ 10.

WHR maintains and operates a computer network that it uses to provide services to the Wyndham-branded hotels. *Id*. ¶ 16. Each Wyndham-branded hotel maintains and operates its own computer network that is separate from, but linked to, WHR's network. *Id*. ¶ 15. On three occasions from 2008 to 2010, criminal hackers gained unauthorized access into WHR's computer network and into the separate computer networks of several Wyndham-branded hotels. *Id*. ¶ 25. The intrusions into the Wyndham-branded hotels' networks may have resulted in the hackers stealing payment card data that the independent hotel owners had collected from their guests. *Id*. Significantly, the FTC does not allege that the hackers stole (or even had access to) any payment card data collected by WHR.

The FTC alleges that WHR violated Section 5 of the FTC Act—which forbids "unfair or deceptive acts or practices in or affecting commerce," 15 U.S.C. § 45(a)(1)—by not maintaining "reasonable and appropriate" data-security protections. Am. Compl. ¶ 1. Although no court has ever construed Section 5 to apply to a private company's data-security practices, the FTC advances two legal theories for its novel construction

4

of the Act. Count I relies on Section 5's prohibition on "decepti[ve]" practices and alleges that WHR deceived consumers by stating on its website that it used "commercially reasonable efforts" to secure payment card data that it collected. *Id*. ¶¶ 21, 44-46. Count II, in contrast, alleges that WHR's data-security protections amounted to "unfair" trade practices under Section 5 because those practices were not "reasonable and appropriate." *Id*. ¶¶ 47-49.

## ARGUMENT

This case is a classic example of agency overreaching. The FTC's Count II "unfairness" claim—which this brief addresses first—stretches far beyond the traditional bounds of the Commission's authority. Nothing in the text or history of Section 5 purports to give the Commission authority to decide whether data-security protections are "unfair," "reasonable," or "appropriate," and Congress's repeated enactment of specific data-security statutes (and failed attempts to enact comprehensive data-security laws) confirm that the statute cannot be construed so broadly. Simply put, Section 5's prohibition on "unfair" trade practices does not give the FTC authority to regulate the data-security practices of private companies.

Although more securely grounded in the requirements of the statute, the FTC's Count I "deception" claim—which relies exclusively on certain statements in WHR's online privacy policy—must also be dismissed. As alleged, the only information compromised during the criminal cyber attacks was certain payment card data collected by independent Wyndham-branded hotels—no data collected *by WHR* was ever placed at risk. Numerous sections of the privacy policy make abundantly clear that WHR made *no representations at all* about the security of data collected by the independent Wyndham-branded hotels. And to the extent the FTC purports to allege that WHR's representations regarding its own data-security practices were deceptive, those allegations fall well short of the heightened pleading requirements of Rule 9(b).

## I. THE COUNT II UNFAIRNESS CLAIM MUST BE DISMISSED

### A. The FTC's Unfairness Authority Does Not Extend To Data Security

"Regardless of how serious the problem an administrative agency seeks to address, … it may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) (quotation marks omitted). That perfectly describes the FTC's complaint in this case. In delegating to the FTC authority to regulate "unfair …. acts or practices," Congress clearly did not authorize the FTC to regulate anything and everything that the Commission might deem "unfair." To the contrary, the reach of the FTC's authority is necessarily limited by Section 5's text, history, and "place in the overall statutory scheme." *Id*. at 133.

Nothing in the plain text of Section 5 suggests that Congress gave the FTC authority to regulate data security, which is itself strong evidence that no such authority exists. *Whitman*, 531 U.S. at 468 ("[Congress] does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions."). Section 5's legislative history also confirms that no such delegation was intended. Since its enactment in 1914, Section 5 has consistently been understood to give the FTC power to forbid certain "unfair" practices; but in enacting Section 5, Congress also thought the FTC would "have ***no power*** to prescribe the methods of competition to be used in the future." 51 Cong. Rec. 14932 (1914) (emphasis added); *see also FTC v. Sinclair Ref. Co.*, 261 U.S. 463, 475 (1923) ("[The FTC] has no general authority to compel competitors to a common level, to interfere with ordinary business methods or to prescribe arbitrary standards for those engaged in … competition.").

Indeed, until quite recently, the FTC specifically ***disclaimed*** the authority to mandate data-security standards through Section 5's "unfair … practices" language. In a 2000 report on information security, the FTC requested broader legislation requiring websites to "take reasonable steps to protect the security of the information they collect from consumers" and "provid[ing] an implementing agency with the authority to

6

promulgate more detailed standards pursuant to the Administrative Procedure Act." FTC, *Privacy Online: Fair Information Practices in the Electronic Marketplace*, May 2000, at 36-37, *available at* http://www.ftc.gov/reports/privacy2000/privacy2000.pdf. Such legislation was necessary, the Report concluded, because "the Commission ***lacks authority to require firms to adopt information practice policies***." *Id.* at 34 (emphasis added); *see also* Scott, 60 Admin. L. Rev. at 130-31 ("In its 2000 Report, the Commission indicated that … it could not require companies to adopt privacy policies [and] proposed legislation that would provide it with the authority to issue and enforce specific privacy regulations.").[1] Since that time, the FTC has made an about-face: now the Commission says that its jurisdiction over "unfair" practices ***does*** give it authority to mandate that companies adopt certain data-security practices.

The FTC's initial view reflected the correct understanding of Congressional intent. As the Supreme Court has explained, subsequently enacted laws "shape or focus [the] meaning[]" of ambiguous statutes, "particularly … where the scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand." *Brown & Williamson*, 529 U.S. at 143. Here, the vast array of more-specific laws governing data security preclude an interpretation of Section 5 that would grant the FTC jurisdiction to regulate data-security practices. For example:

- The Fair Credit Reporting Act ("FCRA"), Pub. L. 108-159, 117 Stat. 1953, codified at 15 U.S.C. § 1681 *et seq.*, imposes requirements for the collection, disclosure, and disposal of data collected by consumer reporting agencies and requires the FTC and other agencies to develop rules for financial institutions to reduce the incidence of identity theft.

- The Gramm-Leach-Bliley Act ("GLBA"), Pub. L. 106-102, 113 Stat. 1338, codified at 15 U.S.C. § 6801 *et seq.*, mandates data-security requirements for financial institutions, and instructs the FTC and federal banking agencies to

---

[1] Other FTC officials have echoed the view that the Commission lacks authority to require private companies to implement certain data-security protections. *See* Jeffrey Benner, *FTC Powerless to Protect Privacy*, Wired, May 31, 2001, *available at* www.wired.com/politics/security/news/2001/05/44173 ("But according to FTC, it doesn't have that kind of power. The agency can order a company to make its stated policy align with practice, but it cannot dictate what those practices will be, or prevent it from changing a policy. 'The agency's jurisdiction is (over) deception,' Lee Peeler, the FTC's associate director for advertising practices, said. 'If a practice isn't deceptive, we can't prohibit them from collecting information. The agency doesn't have the jurisdiction to enforce privacy.'").

establish standards for financial institutions "to protect against unauthorized access to or use of such records or information." 15 U.S.C. § 6801(b)(3).

- The Children's Online Privacy Protection Act ("COPPA"), Pub. L. 105-277, 112 Stat. 2581-728, codified at 15 U.S.C. § 6501 *et seq.*, requires covered website operators to establish and maintain reasonable procedures to protect the confidentiality and security of information gathered from children.

- The Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. No. 104-191, codified at 45 U.S.C. § 1320d *et seq.*, requires health care providers to maintain security standards for electronic health information.

- The Health Information Technology for Economic and Clinical Health Act ("HITECH Act"), Pub. L. No. 111-5, 123 Stat. 115, codified at 42 U.S.C. § 17921 *et seq.*, requires regulated entities to provide notice of unsecured breaches of health information in certain circumstances and strengthens protections for such data.

- The Cable Television Consumer Protection and Competition Act, Pub. L. No. 102-385, 106 Stat. 1460, codified at 42 U.S.C. § 551, requires cable companies to take steps to prevent unauthorized access to the certain subscriber information.[2]

Significantly, several of these laws, including the FCRA, GLBA, and COPPA, grant the FTC authority to regulate data-security standards—but ***only*** in certain specific, limited contexts. Those statutes are powerful evidence that the FTC lacks authority to regulate data-security practices in cases (like this one) that fall outside the confines of those narrow delegations. Indeed, if Section 5's prohibition on "unfair" practices grants the FTC the broad authority it claims in this case, then those statutes would have been entirely superfluous. By delegating certain limited authority to the FTC, Congress has foreclosed any interpretation of Section 5 that would give the Commission overarching authority to set data-security standards for the private sector.

Courts, moreover, "must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency." *Brown & Williamson*, 529 U.S. at 133. Establishing substantive data-security standards for private companies has been a topic of intense debate among members of Congress, the Executive Branch, interest groups, and relevant stakeholders. No less than eight data-security bills were

---

[2] These laws are only the tip of the iceberg. *See also, e.g.*, Video Privacy Protection Act, Pub. L. 100-618 (1988); Driver's Privacy Protection Act of 1994, Pub. L. 103-322; Computer Fraud Abuse Act of 1986, codified as amended at 18 U.S.C. § 1030 *et seq.*

8

introduced in 2011 alone,³ including bills that would have expressly given the FTC the very power that it claims in this litigation. None was enacted. More recently, in a very high-profile and well-publicized debate, Congress considered (and rejected) the Cybersecurity Act of 2012, S. 2105, 112th Cong. (Feb. 14, 2012), which would have created comprehensive "cybersecurity performance requirements" for the private sector. *Id.* § 104. In light of the important economic and political considerations involved in establishing data-security standards for the private sector, and the intense political debate that has surrounded efforts to establish such standards, it offends common sense to think that Congress would have delegated that responsibility to the FTC— particularly through a century-old statute that does nothing more than forbid "unfair" practices. "Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion." *Brown & Williamson*, 529 U.S. at 160; *see Gonzales v. Oregon*, 546 U.S. 243, 267 (2006) (rejecting the "idea that Congress gave the Attorney General such broad and unusual authority through an implicit delegation"); *Whitman*, 531 U.S. at 468 (stating that it is "implausible that Congress would give to the EPA through … modest words the power to determine whether implementation costs should moderate national air quality standards").

Nor is it conceivable that Congress, through implication, would have delegated the task of mandating affirmative data-security requirements ***to the FTC***—an agency that has no particular expertise in either the policy or technology of data-security issues. Congress delegates legislative authority primarily to harness the "relative expertness" that a specialized agency can bring to bear on a subject matter. *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001). The FTC's expertise, however, is in evaluating fair competition and consumer fraud and deception—not in establishing and enforcing

---

³*See* Personal Data Privacy and Security Act of 2011, S. 1151; Data Security and Breach Notification Act of 2011, S. 1207; Data Breach Notification Act of 2011, S. 1408; Data Security Act of 2011, S. 1434; Personal Data Protection and Breach Accountability Act of 2011, S. 1535; Data Accountability and Trust Act, H.R. 1707 (2011); Data Accountability and Trust Act of 2011, H.R. 1841; Secure and Fortify Electronic Data Act, H.R. 2577 (2011).

9

cybersecurity standards for the private sector.  For proof of that, the Court need look no further than the FTC's Amended Complaint in this case.  After a two-year investigation into WHR's data-security practices, the FTC is unable to allege anything more specific than that WHR failed to employ practices that were "reasonable," "appropriate," "adequate," or "proper."  If an agency can provide no more guidance than that, then it has no business attempting to regulate data-security practices in the first-place.  There is, in short, little reason to think that Congress would have wanted the FTC to play such a critical role in an area so far afield from its core competencies.

In the end, this case is analogous to *Brown & Williamson*, in which the Supreme Court rejected the FDA's attempt to regulate tobacco products under the Federal Drug and Cosmetics Act because Congress had subsequently enacted tobacco-specific legislation.  529 U.S. 120.  As in *Brown & Williamson*, "Congress has enacted several statutes addressing the particular subject of [data security]" and has done so "against the background" of the FTC asserting that it "lacks jurisdiction" to mandate data-security practices.  *Id*. at 155-56.  "Under these circumstances, it is clear that Congress' [data-security-specific] legislation has effectively ratified the [FTC's] previous position that it lacks jurisdiction to regulate [data security]."  *Id*. at 156.

### B. Even Assuming the FTC Could Regulate Data Security, Any Such Requirements Would Have To Be Established Through Rulemaking.

For these reasons, Section 5 does not give the FTC authority to mandate data-security standards for the private sector.  But even if it did, the FTC would have to establish data-security standards *ex ante* through rulemaking, rather than *ex post* through a selective enforcement action.

Although agencies have some discretion to make law through the adjudicative process, the Supreme Court and the Ninth Circuit have recognized important limits on that discretion that stem from fundamental notions of fair notice and due process.  Thus, when an agency tries to use an adjudication to announce new principles of law that could have widespread application, the agency has abused its authority by forgoing *ex*

10

*ante* rulemaking in favor of *ex post* adjudication. *See Ford Motor Co. v. FTC*, 673 F.2d 1008 (9th Cir. 1981); *NLRB v. Bell Aerospace Co*., 416 U.S. 267, 294 (1974). In *Ford Motor Co.*, for example, the Ninth Circuit invalidated the FTC's attempt to use an adjudication to announce for the first time that a dealership's practice of repossessing cars could violate Section 5. The FTC's adjudication, the court held, (1) established new law without notice, as it was "the first [relevant] agency action against a dealer," and (2) had "general application" because "practices similar to those [found unlawful] [were] widespread in the car dealership industry," *Ford Motor Co.,* 673 F.2d. at 1010. If the FTC was going to regulate in that area at all, it had to do so through rulemaking.

The same is true in this case. If the Court were to hold that the FTC has authority to mandate data-security standards for the private sector under Section 5, that holding would amount to a clear departure from existing law. And that departure would have widespread application: every U.S. business that collects data from consumers would be required to implement what the FTC mandates. Thus, even if Section 5 could be construed to give the FTC authority over data-security practices, the FTC would be obligated to exercise that authority through rulemaking, not through adjudication. *See id.*; *Patel v. INS*, 638 F.2d 1199, 1204-05 (9th Cir. 1980).

Indeed, permitting the FTC to impose general data-security standards on WHR in this case would raise serious constitutional questions of fair notice and due process. It is a bedrock principle of constitutional law that a defendant must be given fair notice of what the law requires before it can be held liable for its violation. *See United States v. Wunsch*, 84 F.3d 1110, 1119 (9th Cir. 1996); *see also General Elec. Co. v. EPA*, 53 F.3d 1328-29 (D.C. Cir. 1995). Section 5 by itself clearly provides no notice as to what data-security practices a company must adopt to be in compliance with the statute. And the FTC has not issued **any** rules, regulations, or other guidance that would provide such notice. In the absence of any affirmative guidance as to what Section 5 requires in the world of data security, WHR cannot reasonably (or constitutionally) be found to have violated any of the FTC's *post-hoc* data-security standards.

11

### C. Section 5 Does Not Govern The Security of Payment Card Data

Even if Section 5 could be construed to give the FTC authority over some aspects of data security, the statute clearly cannot be stretched so far as to authorize the FTC to regulate the security of consumer payment card data.  Under the statute, a practice can be found unfair only if it "causes or is likely to cause *substantial injury to consumers* which is *not reasonably avoidable* by consumers themselves."  15 U.S.C. § 45(n) (emphasis added).  But, because of the special nature of payment card data, consumer injury from the theft of such data is always avoidable and never substantial.  Federal law places a $50 limit on the amount for which a consumer can be liable for the unauthorized use of a payment card.  *See Id*. § 1643(a)(1)(B).  And all major card brands have adopted policies that waive liability for even that small amount.[4]  Thus consumers can always "reasonably avoid" any financial injury stemming from the theft of payment card data simply by having their issuer rescind any unauthorized charges.

Indeed, at least one FTC Commissioner has taken the view that the FTC cannot use its "unfairness" authority to regulate most data-security practices because the consumer harm involved is "intangible."  *See* Dissenting Statement of J. Thomas Rosch, *Protective Consumer Privacy in an Era of Rapid Change*, at C-4 (March 26, 2012), *available at* http://www.ftc.gov/os/2012/03/120326privacyreport.pdf.  As Commissioner Rosch explained, use of the FTC's "unfairness" authority in that fashion "goes well beyond what the Commission said in the early 1980s that it would do, and well beyond what Congress has permitted the Commission to do under Section 5(n)."

---

[4] *See* Visa, http://usa.visa.com/personal/security/visa_security_program/zero_liability.html ("zero liability" for unauthorized card use); MasterCard, http://www.mastercard.us/zero-liability.html (same); Discover, http://www.discovercard.com/customer-service/fraud/protect-yourself.html (same); American Express, https://www212.americanexpress.com/dsmlive/dsm/dom/us/en/fraudprotectioncenter/fraudprotectioncenter_purchaseprotection.do?vgnextoid126e0918a025c110VgnVCM200000d0faad94RCRD&vgnextchannel=9ee6d6954360c110VgnVCM100000defaad94RCRD&appinstancename=default (same) (all last visited Aug. 22, 2012).

1  *Id*. at C-5.  Adhering to that view, Commissioner Rosch dissented from the FTC's
2  decision to include an "unfairness" claim in its complaint in this case.[5]

3  Even if Section 5 could be construed to mandate certain data-security
4  requirements for payment card data, the standard of liability for failing to protect that
5  data would be demanding and far above what the FTC has alleged in this case.  By
6  statutory command, the requirements imposed by Section 5 must be balanced against
7  the risk of consumer injury.  *See* 15 U.S.C. § 45(n).  And because the risk of consumer
8  injury posed by the theft of payment card data is either non-existent or, at a minimum,
9  exceedingly small, the standard of liability for failing to adequately protect such data
10 would have to be correspondingly high.  That is precisely why courts examining data-
11 security issues under state unfair-trade-practices statutes have held that such practices
12 are unfair only when they are egregious or "reckless" in nature.  *See, e.g.*, *Worix v.*
13 *MedAssets, Inc.*, 2012 WL 1419257, at *6 (N.D. Ill. Apr. 24, 2012).  The FTC, of
14 course, does not allege such recklessness or egregiousness here.

15 As support for its novel theory of Section 5's "unfairness" authority, the FTC is
16 likely to rely on *FTC v. Neovi, Inc.*, 604 F.3d 1150 (9th Cir. 2010).  That case, however,
17 is of no help to the FTC here.  *Neovi* involved a website—Qchex.com—that provided
18 software allowing registered users to electronically draw checks from their bank
19 account and to transmit those checks to third parties.  The website quickly became a
20 tool for "con artists and fraudsters."  *Id*. at 1154.  Having stolen names and bank
21 account information via other means, these fraudsters would open accounts on
22 Qchex.com and draw funds from bank accounts that they did not own.  *Id*.  Because it
23 "facilitated and provided substantial assistance" to those fraudulent activities, *id*. at
24 1156, Oxchex was found liable under the FTC Act.

25 The FTC's theory of liability here is much different.  *Neovi*, to begin, was not a
26 data-security case: Qchex was liable not because it failed to secure sensitive consumer

---

[5] *See* FTC Press Release, *FTC Files Complaint Against Wyndham Hotels* (June 26, 2012), *available at* http://www.ftc.gov/opa/2012/06/wyndham.shtm.

13

data that it had collected (which is the FTC's theory in this case), but because its software allowed fraudsters to exploit data that they previously had stolen *from other entities*. The case thus cannot, and does not, support the FTC's attempt to extend its unfairness jurisdiction to regulating data-security practices. In addition, *Neovi* did not involve the use of payment card data, and thus the Ninth Circuit had no occasion to consider how and whether Section 5 should apply to security for such data. Finally, *Neovi* presented exactly the kind of egregious conduct that traditionally has been the subject of Section 5 litigation. In the website's six-year existence, over 13,750 fraudulent accounts were opened, nearly 155,000 fraudulent checks were issued, and more than *$400 million* in fraudulent funds were drawn from consumers' accounts—an amount that was *more than half* of the total funds that were drawn using Qcheck.com. *Id.* at 1154. That conduct cannot sensibly be compared to that of WHR in this case.

### D. The Unfairness Count Fails Federal Pleadings Requirements.

Finally, the Amended Complaint should be dismissed for the independent reason that it fails to satisfy basic federal-pleading requirements. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Amended Complaint criticizes WHR for failing to employ practices that were "readily available," "adequate," "commonly-used," and "proper." Am. Compl. ¶¶ 24. But nowhere does the FTC give any factual detail as to what procedures, or combination of procedures, would have met those conclusory standards. For example, the FTC alleges that defendants "failed to ensure the Wyndham-branded hotels implemented adequate information security policies," *id.* ¶ 24(c), but never states what policies would be "adequate." It criticizes defendants' operating systems as "outdated," *id.* ¶ 24(d), but fails to allege what alternative systems would be current. And it states that defendants "failed to employ reasonable measures to detect and prevent unauthorized access," *id.* ¶ 24(h), but does not explain what measures would be "reasonable"—now or when the alleged breaches occurred. Simply put, the FTC's allegations are nothing more than "legal conclusions couched as factual allegations"

14

1  and do not state a plausible claim for relief.  *Worden v. Fed. Home Loan Mortg. Corp.*,
2  2010 WL 2292943 (D. Ariz. June 8 2010).

## II. THE COUNT I DECEPTION CLAIM FAILS AS A MATTER OF LAW

The FTC's Count I deception claim fares no better than its Count II unfairness claim.  To impose liability under the "deception" prong of Section 5, the FTC must identify (1) a representation; that (2) is "likely to mislead consumers acting reasonably under the circumstances;" that (3) is "material."  *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009).  Because such a claim "sounds in fraud," the FTC must meet the heightened pleading requirements of Rule 9(b) when alleging unlawful deception.  *FTC v. Lights of Am., Inc.*, 760 F. Supp. 2d 848, 853 (C.D. Cal. 2010); *FTC v. Ivy Capital, Inc.*, 2011 WL 2118626, at *3 (D. Nev. May 25, 2011).

As the sole basis for its claim, the FTC alleges that WHR deceived consumers because its online privacy policy stated that it used "industry standard practices" and "commercially reasonable efforts" to secure the payment card data that it collected.  *See* Ex. 1, Allen Decl., Ex. A, at 1.[6]  Those statements were deceptive, the FTC claims, because WHR failed to implement "reasonable and appropriate measures" to protect the payment card data collected by the Wyndham-branded hotels.  Am. Compl. ¶ 45.  But there is a clear disconnect in those allegations—namely, the FTC fails to recognize the fundamental distinction between data collected by WHR itself (to which the privacy policy applies) and data collected by the independently owned Wyndham branded hotels (to which the privacy policy expressly does not apply.)

WHR and the independently owned Wyndham-branded hotels each engage in their own separate data-collection and storage practices.  As a franchisor, WHR collects payment card data through its centralized reservations service—which permits guests to book hotel rooms either online or over the phone—and stores that information on its

---

[6] "Consideration of materials incorporated by reference in the complaint is permitted when plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document."  *Spinedex Physical Therapy USA, Inc. v. United Healthcare of Ariz., Inc.*, 661 F. Supp. 2d 1076, 1083 (D. Ariz. 2009).

15

corporate network. *See* Allen Decl., Ex. A, at 2. In addition, and separate and apart from WHR's practices, the independently owned hotels also collect payment card data and store that data on their local networks. *Id*. at 4.

As the text of the WHR privacy policy makes abundantly clear, the policy applies only to the security of payment card data collected by WHR and does not purport to say anything at all about the security of payment card data collected by the Wyndham-branded hotels. Thus, the privacy policy consistently uses the terms "we," "us," or "our" when making representations about WHR's data-security practices, and specifically defines those terms to ***exclude*** the Wyndham-branded hotels. *Id*. at 1. The policy also expressly caveats each representation about data-security by explaining that those representations apply only to "our collection" of data and only "to the extent we control the Information"—caveats that plainly exclude any data collected by the Wyndham-branded hotels. *Id*. And if all of that were not enough, the privacy policy includes a separately-titled section—which the FTC conveniently omitted from its quotation of WHR's privacy policy in the Amended Complaint—that explains the policy makes ***no representations*** about the security of data collected by franchisees:

> **Our Franchisees.**
> Each Brand hotel is owned and operated by an independent Franchisee that is neither owned nor controlled by us or our affiliates. Each Franchisee collects Customer Information and uses the Information for its own purposes. We do not control the use of this Information or access to the Information by the Franchisee and its associates. The Franchisee is the merchant who collects and processes credit card information and receives payment for the hotel services. The Franchisee is subject to the merchant rules of the credit card processors it selects, which establish its card security rules and procedures.

*Id*. at 4. Thus, evaluating the "net impression" of the privacy policy and construing the policy "as a whole," *FTC v. Connelly*, 2006 WL 6267337, at *10 (C.D. Cal. Dec. 20, 2006), any reasonable consumer would have understood that the policy was making statements only about data collected by WHR, and not about the security of data collected by independently-owned Wyndham-branded hotels.

16

1    That fact is fatal to the FTC's deception claim.  The only basis on which the FTC attempts to show that the privacy policy was "likely to mislead consumers" is by pointing to three instances in which cybercriminals were able to access payment-card data collected and controlled *by the independently owned hotels*.  *See* Am Compl. ¶¶ 25, 30-31, 34-35, 37.  But, as explained, the WHR privacy policy does not make any representations at all about the security of data collected by the Wyndham-branded hotels—indeed, the policy *expressly disclaims* making any such representations.

Perhaps recognizing this critical flaw in its argument, the FTC makes a half-hearted attempt to allege that WHR did not adequately protect the data that WHR itself collected and stored.  But those allegations amount to nothing more than conclusory statements of wrongdoing that fall well short of establishing a "plausible" claim to relief.  *Iqbal*, 556 U.S. at 678.  For example, although the Amended Complaint purports to list a series of alleged data-security deficiencies, the great majority of those relate only to the security of data collected by the Wyndham-branded hotels—which, as explained, the privacy policy says nothing at all about.  *See* Am. Compl. ¶¶ 24(a)-(f).  And those allegations which even arguably apply to WHR's network all rely on unadorned legal conclusions that are completely devoid of any specific factual development.  Thus, although the Amended Complaint alleges that WHR did not employ certain "adequate[]," "reasonable," or "proper" practices, *id*. ¶¶ 24(g)-(j), the FTC makes no attempt to explain what those terms mean or what it believes would have been "adequate[]," "reasonable," or "proper" in those specific contexts.  And most telling of all: the FTC nowhere alleges that any intruder ever compromised (or even had access to) data collected by WHR.  That fact, coupled with the barebones nature of the FTC's allegations concerning the security of data collected by WHR, conclusively undermines any argument that the WHR privacy policy was somehow "deceptive."

## CONCLUSION

For all of these reasons, WHR respectfully requests that the Court dismiss the FTC's complaint as a matter of law.

1   DATED this 27th day of August, 2012.

2  OSBORN MALEDON, P.A.

3
4  By s/David B. Rosenbaum
   David B. Rosenbaum
   Anne M. Chapman
5  2929 North Central Avenue, Suite 2100
6  Phoenix, Arizona  85012-2794

7  Eugene F. Assaf, P.C., 449778, *pro hac vice*
8  K. Winn Allen, 1000590, *pro hac vice*
   Kirkland & Ellis LLP
9  655 Fifteenth Street, N.W.
   Washington, D.C.  20005
10

11  Douglas H. Meal, 340971, *pro hac vice*
    Ropes & Gray, LLP
12  Prudential Tower, 800 Boylston Street
13  Boston, MA  02199-3600

14  Attorneys for Defendants

15
16
17
18
19
20
21
22
23
24
25
26
27
28

18

**CERTIFICATE OF SERVICE**

☒ I hereby certify that on August 27, 2012, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

- **Kristin Krause Cohen;** kcohen@ftc.gov
- **John Andrew Krebs;** jkrebs@ftc.gov
- **Katherine E McCarron;** kmccarron@ftc.gov
- **Kevin H Moriarty;** kmoriarty@ftc.gov
- **Lisa Naomi Weintraub Schifferle;** lschifferle@ftc.gov
- **Andrea V. Arias;** aarias@ftc.gov

Attorneys for Plaintiff, Federal Trade Commission

                                        s/Kelly Dourlein